UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


United States of America,                                    Case No. 3:20-cr-795

        Plaintiff,

    v.                                                       MEMORANDUM OPINION
                                         AND ORDER

Eddie Lee Pope,

        Defendant.


## I.    INTRODUCTION

Defendant Eddie Lee Pope[1] has filed four motions: (1) a motion to suppress evidence obtained contemporaneously with his arrest, (Doc. No. 29); (2) a motion to dismiss the charges against him, (Doc. No. 34); (3) a motion to strike testimony submitted to the grand jury, (Doc. No. 35); and (4) a motion for an evidentiary hearing regarding his motion to strike.  (Doc. No. 40).  He also filed a supplement to his motion to suppress.  (Doc. No. 36).

The government filed an omnibus response to Pope's first three motions.  (Doc. No. 37). Pope filed reply briefs in support of those motions.  (Doc. Nos. 38, 39, and 40).  The government has not yet responded to Pope's motion for a hearing.

For the reasons stated below, I deny each of Pope's motions.

---

[1]  Pope is proceeding *pro se* in this case, with the Office of the Federal Public Defender appointed as stand-by counsel.  (*See* non-document entry dated November 10, 2020).

## II.  BACKGROUND

On June 4, 2021, I held an evidentiary hearing regarding Pope's motion to suppress, during which the government presented testimony from Trooper Ryan Noblet of the Ohio State Highway Patrol, as well as evidence in the form of a recording from the dash camera of Noblet's cruiser.

Just after midnight on October 14, 2020, Noblet was parked in his cruiser in the crossover on State Route 15, near mile post 3 in Wyandot County, Ohio, when he observed a vehicle heading eastbound.  (Doc. No. 33 at 14).  The vehicle was traveling at a rate below the posted speed limit and, as the car drove past the crossover, Noblet observed the driver (subsequently determined to be Pope[2]) was leaning back behind the vehicle's B-pillar.[3]  (*Id.*).  Noblet pulled out from the crossover and followed the vehicle for approximately two miles.  (*Id.* at 15-16).  During this time, Noblet also observed the vehicle swerving within its lane.  These things – traveling below the speed limit, the driver leaning back behind the B-pillar, and the swerving within the line – in combination with the time of night, led Noblet to suspect the driver of the vehicle was distracted or might be operating the vehicle while intoxicated.  (*Id.* at 17).

Noblet continued following the vehicle.  He then observed the driver's side tires cross over the yellow fog line and, later, the passenger side tires traveling on the white fog line in the other lane.  (*Id.* at 19-20; *see also* Doc. No. 37 at 10).  Noblet stopped the vehicle and provided the license plate number from the vehicle to a dispatcher.  (Doc. No. 33 at 21).  The dispatcher indicated the license plate was registered to a GMC Yukon; the vehicle Noblet had pulled over was a Chevy Malibu.  (*Id.*).

Noblet approached the vehicle and Pope provided his Michigan driver's license.  (*Id.* at 22).  Noblet noticed an odor of marijuana coming from the car and observed marijuana cigarettes in the

---

[2] (Doc. No. 33 at 22).

[3]  The B-pillar is "either one of two support posts that connect a vehicle's roof to its body at the rear of the front door."  *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/B-pillar (last visited Sept. 13, 2021).

center console.  (*Id.*).  Noblet instructed Pope to step out of the vehicle and patted him down.  (*Id.* at 23).

While patting him down, Noblet felt something near Pope's groin, in front of his genitals.  (*Id.*).  Pope told Noblet it was a colostomy bag.  This claim struck Noblet as "odd" because, in his experience, colostomy bags typically were located on the patient's abdomen, and because the bag contained a hard substance which "[f]elt like ice . . . [except that] it was not cold."  (*Id.*).

Noblet then prepared to conduct a field sobriety test.  At that point, Pope asked Noblet what he was doing, and then began running away from the road toward a wooded area nearby.  (*Id.* at 26-27).  After a short period, officers apprehended Pope.  When they searched Pope again, he did not have any contraband on him; nor did the officer find the object Pope earlier had claimed was a colostomy bag.  (*Id.* at 28-29).  But the officers did locate a "plastic bag . . . [containing] a white crystalized substance" near a fence Pope had climbed while fleeing the traffic stop.[4]  (*Id.* at 29).

It ultimately was determined that the package contained over 400 grams of methamphetamine.  (Doc. No. 1-1 at 3).  Pope subsequently was indicted by a federal grand jury on one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).  (Doc. No. 8).

### III.  ANALYSIS

#### A.  MOTION TO SUPPRESS

Pope contends the evidence against him must be suppressed because Noblet did not have a basis to stop his vehicle.  This argument lacks merit.

"It is well established that a police officer lawfully may stop a car when he has probable cause to believe that a civil traffic violation has occurred, or reasonable suspicion of an ongoing

---

[4]  Pope was cited for committing a marked lanes violation pursuant to Ohio Revised Code § 4511.33(a)(1), as well as for distracted driving in violation of § 4511.991.  (Doc. No. 33 at 42).

crime." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) (citing *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)).  "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *Blair*, 524 F.3d at 748 (citations omitted).

When a driver travels an Ohio roadway with two or more clearly marked lanes, the driver must stay "as nearly as is practicable, entirely within a single lane or line of traffic . . . ."  Ohio Rev. Code § 4511.33(A)(1).  An officer may stop a vehicle if the officer "witnesses a motorist drift over the lane markings in violation of [section] 4511.33, even without further evidence of erratic or unsafe driving." *State v. Mays*, 894 N.E.2d 1204, 1210 (Ohio 2008).

Noblet testified, and the video recording demonstrates, that the tires of Pope's vehicle traveled over the solid edge line.[5]  (*See* Doc. No. 37 at 10).  This renders immaterial Pope's arguments concerning: (a) whether he was swerving within his lane, (b) when Noblet could observe his license plate number, (c) how fast he was going, and (d) whether the public was in danger due to his driving.  (*See* Doc. No. 29 at 5-6; Doc. No. 36 at 6-7).  The record evidence demonstrates Noblet had probable cause to believe Pope had violated § 4511.33 before initiating the traffic stop.

Next, Pope repeatedly claims Noblet is not credible.  (*See, e.g.,*, Doc. No. 29 at 7; Doc. No. 39 at 3).  After observing Noblet's demeanor and presentation while on the witness stand, however, I conclude his testimony concerning the Malibu's path of travel onto and over the lane markings was credible and consistent with the events recorded by his vehicle's dash camera. *Cf. United States v. Jackson*, 682 F.3d 448, 453-54 (6th Cir. 2012) (noting a judge's credibility determinations with respect to testimony offered during a suppression hearing are entitled to deference from a reviewing court).

---

[5]  Pope claims the still image included in the government's brief actually weighs in favor of granting his motion, because "the right side taillight [is] brighter than the left to indicate a lane change while using the right side turning signal."  (Doc. No. 39 at 4).  Even if Pope is correct that this image reflects his use of his right turn signal, this image does not help him, because the image shows him traveling over the lane line on the <u>left</u> side of his vehicle, rendering any use of the <u>right</u> turn signal meaningless.

Moreover, Pope's assertion that Noblet committed perjury when he testified that Pope's license plate was registered to a different vehicle is baseless.  (Doc. No. 39 at 4-5).  Noblet testified he initiated the traffic stop and then learned the license plate was registered to a Yukon and not Pope's Malibu.  (Doc. No. 33 at 20-21).  Noblet did not testify (as Pope insinuates) that he initiated the traffic stop due to the improper license plate.

Pope also argues, citing to *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), that Noblet was conducting an illegal checkpoint at the time he stopped Pope's vehicle because Noblet was engaged in conduct which represented "a general interest in crime control."  (Doc. No. 36 at 3).  Pope's argument falls short.

In *Edmond*, the Supreme Court held that the City of Indianapolis could not maintain a program in which it stopped a predetermined number of vehicles at various checkpoints on roadways in order to look for evidence that a vehicle was involved in the trafficking of illegal narcotics.  *Edmond*, 531 U.S. at 34-35.  The Supreme Court rejected the use of suspicionless vehicle seizures for the "primary purpose . . . [of] detect[ing] evidence of ordinary criminal wrongdoing."  *Id.* at 38.

Here, Pope was not forced to stop at a predetermined roadblock, where an officer then questioned him.  Instead, Noblet did not impede Pope's progress until he had witnessed Pope engage in conduct which he believed violated the law.  Further, at no point did the *Edmond* Court suggest police officers cannot monitor traffic on public roads for possible moving violations.

Finally, Pope offers a variety of other challenges to the traffic stop, including that: (1) Article VIII, Section 4 of the Ohio Constitution offers him protection from the enforcement of § 4511.33(a)(1) and greater protection than that provided by the United States Constitution, (Doc. No. 29 at 4-5; Doc. No. 36 at 8; Doc. No. 39 at 2); (2) there is no evidence he was near a body of water

or dock, (Doc. No. 36 at 8-9); (3) the Fourth Amendment does not permit the government to "over-police people of color," (*id.* at 10).

These arguments are of no help to Pope.  First, he fails to identify any legal basis for his claim that the Ohio Constitution prohibited Noblet from pulling him over.  I already have concluded his maritime law arguments are meritless.  (Doc. No. 30 at 2-4).  And he offers no evidence that Noblet was aware of his race before Noblet stopped his vehicle, much less that Noblet stopped him <u>because of</u> his race.

I conclude Pope has failed to meet his burden of showing the traffic stop or subsequent seizure of the methamphetamine[6] violated his Fourth Amendment rights.  Therefore, I deny his motion to suppress.

### B.    MOTION TO DISMISS

Pope moves to dismiss the charge against him for failure to state an offense.  (Doc. No. 34).  He contends "the alleged controlled substances – methamphetamine hydrochloride and dimethyl sulfone – [do] not comport as a [scheduled] controlled substance passed by the elected law writing body of Congress . . . ."  (*Id.* at 1).  He claims, therefore, that his indictment violated his due process rights.  (*Id.*).  Pope's argument lacks merit.

Section 812 lists, as a controlled substance, any substance or liquid "which contains any quantity of methamphetamine, including its salts, isomers, and salts of isomers."  21 U.S.C. § 812(c); 21 C.F.R. § 1308.12(d); *see also United States v. Schrock*, 855 F.2d 327, 331-32 (6th Cir. 1988) (holding Congress' delegation of rule-making authority to the Attorney General in 21 U.S.C. § 811(a)(1) was constitutionally permissible and that upholding the Attorney General's redesignation of

---

[6]  The government argues Pope abandoned any expectation of privacy in the bag containing the methamphetamine when he discarded it by the fence.  (Doc. No. 37 at 13).  Pope does not discuss this issue in his briefing, (*see* Doc. Nos. 29, 36, and 39), and I conclude he has waived any challenge to the seizure of the drugs.

noninjectable methamphetamine as a Schedule II controlled substance).  Further, as I previously noted, (Doc. No. 30 at 4-5), § 841 makes it "unlawful for any person knowingly or intentionally . . . [to] possess with intent to . . . distribute . . . a controlled substance," including "50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers . . . ."  21 U.S.C. § 841(a)(1), (b)(1)(A)(viii).

Pope fails to show his due process rights were violated.  Federal law plainly proscribes the possession of methamphetamine with the intent to distribute that substance.  Therefore, I deny his motion to dismiss.

### C.    MOTION TO STRIKE

Finally, Pope has filed a motion to strike testimony presented to the grand jury, pursuant to Federal Rule of Civil Procedure 12(f), (Doc. No. 35), as well as a motion for an evidentiary hearing on his motion to strike.  (Doc. No. 40).  Pope argues his indictment is tainted by the government's presentation to the grand jury of evidence of Pope's prior felony drug convictions.  I conclude a hearing is not necessary, as Pope has not met his burden of showing there are material facts in dispute that require a hearing to resolve.  *See, e.g., United States v. Edgeworth*, 889 F.3d 350, 353-54 (7th Cir. 2018); *United States v. Fattah*, 858 F.3d 801, 810 (3rd Cir. 2017).

As an initial matter, I already have made clear that these proceedings are governed by the Federal Rules of Criminal Procedure, not the Federal Rules of Civil Procedure, and I deny Pope's motion to the extent he seeks relief only under the Civil Rules.  (*See* Doc. No. 30 at 3-4)  I also deny Pope's motion to strike to the extent it relies upon Pope's meritless arguments concerning maritime jurisdiction and admiralty law, including his assertion that Congress enacted § 841 only under its authority to punish felonies committed on the high seas.  (Doc. No. 35 at 2-5).

7

Further, I deny Pope's motion to the extent he alleges the government violated his due process rights by presenting evidence to the grand jury concerning his prior convictions and by failing to present exculpatory evidence to the grand jury.  (*Id.* at 3-5).

Pope claims that, by informing the jury of his prior drug convictions, the government violated his constitutional rights as described in *Alleyene v. United States*, 570 U.S. 99 (2013), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  (Doc. No. 35 at 5-6).  Pope's argument is not persuasive.  First, *Alleyene* and *Apprendi* address factors relevant to the sentence or sentencing range which applies once a defendant has been found guilty of a charged offense.  Those cases do not, in any way, address grand juries.

Instead, the Supreme Court has repeatedly held "many of the rules and restrictions that apply at a trial do not apply in grand jury proceedings."  *United States v. R. Enter., Inc.*, 498 U.S. 292, 298 (1991).  In particular, the Supreme Court has expressly forbidden the lower courts from considering "the competency and adequacy of the evidence before the grand jury."  *Costello v. United States*, 350 U.S. 359, 363 (1956) ("An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits.  The Fifth Amendment requires nothing more.").  Pope's claim that the grand jury would not have indicted him if not for the evidence concerning his prior convictions is mere speculation – speculation in which courts are prohibited from engaging.  *United States v Adamo*, 742 F.2d 927, 938-39 (6th Cir. 1984), *abrogated on other grounds by Buford v. United States*, 532 U.S. 59 (2001).

Lastly, Pope fails to show the government misled the grand jury by failing to present exculpatory evidence.[7]  The "exculpatory evidence" to which Pope refers derives from his claim the government prohibited the grand jury from hearing evidence concerning the basis for Congress'

---

[7]  Even if Pope had identified any actual exculpatory evidence, the government would have had no duty to disclose that evidence to the grand jury.  *United States v. Adamo*, 742 F.2d 927, 937 (6th Cir. 1984) ("A federal prosecutor is not obligated to present exculpatory evidence to the grand jury.").

8

authority to enact the statute which he is charged with violating.  (Doc. No. 35 at 4-5).  He posits Congress passed § 841 pursuant to its authority derived from Article I, Section 8, Clause 10 of the Constitution: "The Congress shall have Power . . . To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations . . . ."  U.S. Const. art. I, § 8, cl. 10.  It is well-established, however, that Congress' authority to criminalize drug trafficking arises from its authority to regulate commerce under Article I, Section 8, Clause 3.  *See, e.g., United States v. Tucker*, 90 F.3d 1135, 1139-42 (6th Cir. 1996).  Thus, Pope's argument lacks merit.

## IV.  CONCLUSION

For the reasons set forth above, I deny Pope's motions.  (Doc. Nos. 29, 34, 35, and 40).  So Ordered.


s/ Jeffrey J. Helmick
United States District Judge